## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

---

ZANE JOHNSON,                                    CV 10-126-M-JCL

              Plaintiff,

    vs.

                              ORDER

AMERICAN HONDA MOTOR
COMPANY, INC.,

              Defendant.

---

This products liability action comes before the Court on Defendant American Honda Motor Company, Inc.'s ("Honda") motion for summary judgment and Plaintiff Zane Johnson's ("Johnson") motions in limine.[1] The motions are granted in part and denied in part as set forth in detail below.

## I.    <u>Background</u>

For summary judgment purposes, the Court is to take the material facts from the record and, where disputed, view them in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 474 U.S. 574, 587-88 (1986). This task is complicated somewhat by the fact that Johnson

---

[1] Honda has also filed several motions in limine, which will be addressed by way of separate order.

has not submitted a statement of genuine issues in response to Honda's summary judgment motion as required by Local Rule 56.1(b). Without such a "statement of genuine issues, the party seeking summary judgment and the Court are left to search the record for evidence that could demonstrate a genuine issue of material fact for trial." *Groves v. Croft*, 2011 WL 5509028, *12. "It is not this Court's task, however, 'to scour the record in search of a genuine issue of triable fact.'" *Groves*, 2011 WL 5509028, *12 (quoting *Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*, 2011 WL 4852472, *1 (C.D. Cal. 2011). Because Johnson has not complied with Local Rule 56.1(b), Honda argues that the statement of facts it has presented in support of its motion should constitute the complete and undisputed factual record for summary judgment purposes.

While Johnson has not filed the requisite statement of genuine issues, he has submitted a brief in opposition to Honda's motion and attached several exhibits. The Court does not take Johnson's failure to comply with the Local Rules lightly. Nonetheless, the nature of Honda's motion and the state of the record is such that the Court can, and will, look to the submissions of both parties to determine whether a genuine issue of material fact exists.

In mid-March 2007, Plaintiff Zane Johnson ("Johnson") purchased a new 2007 Honda TRX 420FE four-wheeled, all-terrain vehicle ("ATV") from Five

Valley Honda in Missoula, Montana.  Dkt. 50-2, at 2.  The ATV was manufactured, assembled, and designed by Honda.

On July 4, 2007, Johnson was driving the ATV on a maintained forest road when he failed to negotiate a right-hand turn and crashed.  Dkt. 50-2, at 4-8. According to Johnson, the ATV's handlebars had locked up earlier that day and would not turn.  Dkt. 50-2, at 4.  Johnson and one of his riding companions, Rick Harrison ("Harrison") visually inspected the ATV but were not able to identify any problem.  Dkt. 50-2, at 5.  Harrison then rode the ATV "a little ways to see if [he] could get it to steer" and it  suddenly "started steering again, just normal...."  Dkt. 50-3, at 5.

Johnson got back on his ATV, and although the steering remained "tight" he and his companions continued on toward their destination.  Dkt. 50-1, at 5. Johnson was traveling at approximately 20 to 25 miles per hour in second or third gear when he approached a right turn in the road.  Dkt. 50-1, at 8.  Johnson has testified that just as he was "getting ready to do the turn" the steering "locked up again" and he was unable to turn the handlebars more than approximately an eighth of an inch in either direction.  Dkt. 50-1, at 8-9.  Johnson's ATV continued going straight, and the next thing he knew he "was off the road in midair" as the ATV tumbled down a steep embankment.  Dkt. 50-1, at 8.  Johnson was injured in

the crash, and sought medical treatment.  Dkt. 20, ¶ 5.

In June 2010, Johnson commenced this action in state court against Honda, asserting claims for strict products liability based on design and manufacturing defects, negligence, and breach of express warranty.  Dkt. 4.  Honda later removed the case to this Court based on diversity jurisdiction, and Johnson amended his complaint to withdraw his negligence claim.[2]  Dkt. 1 & 9.

As set forth in the Amended Complaint, Johnson's strict product liability claim alleges that "[t]he ATV was defective in that during assembly an expandable clip that should have locked the right side front axle to the CV joint during assembly had not been properly assembled, resulting in a defective condition."  Dkt. 9, ¶ 8.  Alternately, the claim alleges that the ATV was defective because the "expandable clip that locked the right side front axle to the CV joint failed, resulting in a defective condition."  Dkt. 9, ¶ 9.

Honda moves for summary judgment on two alternative grounds.  First, Honda argues that Johnson cannot prevail against it on any theory of recovery

---

[2] According to Honda, Johnson expressly disclaimed any negligence allegation in his Response to Honda's Non-Uniform Interrogatory No. 16.  Dkt. 49, at 16.  Although Honda refers to Johnson's discovery response as Exhibit K in its statement of undisputed facts, there is no Exhibit K attached.  It is nonetheless apparent that Johnson has withdrawn his negligence claim because he does not argue otherwise in response to Honda's motion and there are no allegations of negligence in the Amended Complaint.

because the undisputed evidence shows that the only defect Johnson has alleged did not exist at the time of manufacture, and would not have caused the steering condition he described on the day of the accident. Alternatively, Honda argues it is entitled to summary judgment because the opinions of Johnson's only expert witness are inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Johnson has no evidence to support his manufacturing defect claim.

## II. <u>Motion for Summary Judgment</u>

### A. Legal Standards

A party moving for summary judgment bears the burden of demonstrating "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may satisfy that burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. And where the nonmoving party bears the burden of proof at trial, the moving party may satisfy its initial burden on summary judgment by showing that there is an absence of evidence in the record to support the nonmoving party's claims. *Celotox*, 47 U.S. at 325.

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp.* 477 U.S. 317, 324 (1986).

### B. Discussion

The Montana Supreme Court has adopted the theory of strict products liability set forth in Restatement (Second) of Torts § 402A, which states that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer...is subject to liability for physical harm thereby caused to

the ultimate user or consumer..."[3] *Patch v. Hillerich & Bradsby Co.*, 257 P.3d 383, 387 (Mont. 2011) (quoting § 402A).  To establish a prima facie case in strict product liability, a plaintiff must prove that: "(1) The product was in a defective condition, 'unreasonably' dangerous to the user or consumer; (2) The defect caused the accident and injuries complained of; and (3) The defect is traceable to the defendant."  *Wood v. Old Trapper Taxi*, 952 P.2d 1375, 1379 (Mont. 1997) (quoting *Brown v. North Am. Mfg. Co.*, 576 P.2d 711, 717 (Mont. 1978)).

A plaintiff may pursue such a claim for strict product liability based on design defect, manufacturing defect or failure to warn theories.  See e.g., *Patch v. Hillerich & Bradsby Co.*, 257 P.3d 383, 386 (Mont. 2011).   Johnson has pled two of these three theories here, alleging that the ATV he purchased "was in a defective condition and unreasonably dangerous" because of a manufacturing defect and a design defect.  Dkt. 9, ¶¶ 6-9.

### 1.   Manufacturing Defect

Honda argues that Johnson's manufacturing defect claim should be summarily dismissed because the undisputed evidence of record establishes both that the ATV was not defective at the time of manufacture, and that the alleged

---

[3]Sitting in diversity jurisdiction, this Court applies the substantive law of Montana as the forum state.  *See Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

defect did not cause the accident.

The central question under a manufacturing defect theory "is whether the product is flawed due to improper construction." *Woods v. Old Trapper Taxi*, 952 P.2d 1375, 1379 (Mont. 1997). Manufacturing defects are "imperfections that inevitably occur in a typically small percentage of products of a given design as a result of the fallibility of the manufacturing process." *Woods*, 952 P.2d at 1379. "A defectively manufactured product does not conform in some significant aspect to the intended design, nor does it conform to the great majority of products manufactured in accordance with that design." *Woods*, 952 P.2d at 1379.

To recover in strict liability based on a manufacturing defect, Johnson must show, among other things, that the ATV was defective at the time of manufacture before leaving Honda's possession, custody, and control. See e.g., *Wood*, 952 P.2d at 1380; *Schelske v. Creative Nail Design, Inc.*, 933 P.2d 799, 803 (Mont. 1997). Johnson must also show that the defect caused the accident and his injuries. *Wood v. Old Trapper Taxi*, 952 P.2d 1375, 1379.

a. *Time of Manufacture*

Honda first argues it is entitled to summary judgment on this claim because the undisputed physical evidence establishes that the only defect identified by Johnson's expert was not present at the time of manufacture. Johnson has

disclosed Rob Larson ("Larson"), an Assistant Professor in the Department of Mechanical and Industrial Engineering at Montana State University, as his sole expert. Larson examined the ATV for the purpose of determining whether there was a mechanical explanation for the steering difficulties that Johnson described and prepared a written report. Dkt.50-6, Dkt. 50-8, at 4.

Larson wrote in his report that "[t]he right front axle assembly" of the ATV "exhibited severe and unusual wear patterns," which he believed were "caused by the improper assembly of the right front ATV axle with the right front constant-velocity joint." Dkt. 50-6, at 4. In particular, Larson found the "[e]vidence indicate[d] that during assembly the outboard splined end of the axle was likely not correctly inserted deep enough into the mating constant-velocity joint splines, and as a result the circular retaining clip that should have securely fixed the two parts together did not expand within the constant-velocity joint to retain the axle in the correct location." Dkt. 50-6, at 4. According to Larson, the "[i]mproper coupling between the right front drive axle and the right front constant-velocity joint resulted in the inability of the two components to work together as one," which "caused severe wear of the outboard axle splines as they ground away at the internally-splined constant-velocity joint over time." Dkt. 50-6, at 4. Larson concluded that "[t]he metal-on-metal contact of two rough surfaces caused

difficult and unpredictable steering response during vehicle operation," which "was a likely substantial contributing factor in the accident." Dkt 50-6, at 4.

As Honda notes, part of Larson's theory is that the ATV's front right axle shaft was not properly assembled because it was not inserted deeply enough into the right front constant-velocity joint. According to Honda, however, the "undisputed physical evidence" proves otherwise. Dkt. 49, at 11. For support, Honda relies on the opinion of its own expert, metallurgical engineer Michael Stevenson ("Stevenson"), who performed a microscopic evaluation of the ATV's axle shaft and prepared a written report. Stevenson evaluated both the left and right front driveshafts from the ATV, and found "witness marks on the spline faces that ended approximately 1 mm from the inboard end of the splines." Dkt. 50-9, at 17. As Stevenson explains it, these so-called "witness marks" resulted "from the interference fit," or engagement with, "the splines of the shaft and outboard CV joints." Dkt. 50-9, at 13-14. Stevenson determined that those witness marks, which were consistent with those he observed on properly assembled exemplar driveshafts, "could not have resulted if the driveshafts were not completely inserted into the outboard CV joints." Dkt. 50-9, at 17. Noting that an ATV's "driveshaft assembly experiences little to no longitudinal loads during service," Stevenson concluded it was "most likely that the insertion witness

marks were created during initial assembly by Honda or their representatives, at the time of manufacture." Dkt. 50-9, at 17. In closing, Stevenson wrote that "Larson's opinion that the right front driveshaft on the subject ATV was never fully inserted into the outboard CV joint is not supported by the available physical evidence." Dkt. 50-9, at 18.

As Honda sees it, Stevenson's opinion unequivocally puts to rest any question as to whether or not the ATV's right front axle was properly assembled. In the Court's view, however, Larson's opinion to the contrary is sufficient to raise a genuine issue of material fact as to whether the ATV was defective when it left Honda's possession, custody, and control. Larson concluded based on his own examination that it was likely that the ATV's right front axle had not been properly coupled with the right front constant velocity joint during assembly, as evidenced by the severe and unusual wear patterns on the ATV's right front axle. Dkt. 50-6, at 4. In other words, Larson has essentially concluded that the right front axle was not properly coupled with the constant-velocity joint, because if it had been, then those severe and unusual wear patterns would not have been present.

While Stevenson disagrees with Larson, and has concluded based on his own examination that the axle was fully inserted into the constant velocity joint,

he does not provide any explanation for the severe wear exhibited on the axle.

It is true, as Honda points out in its reply brief, that Johnson is the one who bears

the burden of establishing that the ATV was defective, which means that Honda

does not necessarily have to provide an explanation for the severe wear on the

axle. Nonetheless, as it now stands the record contains two competing expert

opinions – one of which is that the right front axle was fully inserted into the

constant velocity joint at the time of manufacture as evidenced by the witness

marks, and one of which is that the axle was not fully inserted into the constant

velocity joint at the time of manufacture as evidenced by the severe wear patterns.

It will be for the trier of fact to determine what weight to give each expert's

opinion.

        b.    *Causation*

Even assuming, as the Court has decided, that there is a factual question as

to whether or not the ATV's right front axle was properly assembled, Honda

argues the undisputed expert evidence proves that failure to fully insert the axle

shaft "would not cause the stiff steering condition plaintiff described" and did not

cause Johnson's accident. Dkt. 73, at 5. Honda begins by citing the opinion of its

accident reconstructionist expert, Kris Kubly. According to Honda, Kubly

performed testing on an exemplar ATV with the axle shaft improperly inserted and

then completely removed, and his results "prove[] that neither scenario causes the steering condition described by" Johnson.[4]  Dkt. 49, at 11; Dkt. 50, ¶¶ 64-65.

Honda's mechanical engineering expert, Graeme Fowler, also conducted tests on an exemplar ATV, one of which involved using an output shaft that had been machined "to approximate the condition of the accident shaft."[5]  Dkt. 50-10, at 19.  After the ATV had been operated for a total of 15.6 miles on an off-road riding course, Fowler concluded that the vehicle's steering response was "unaffected by the condition of the output shaft."  Dkt. 50-10, at 20.  Honda maintains that Kubly's and Fowler's opinions unequivocally establish that the alleged defect would not have caused any steering problems.

As discussed above, however, Larson reached a contrary conclusion based on his examination of the ATV.  Larson determined it was likely that the right front axle had not been inserted deeply enough into the constant-velocity joint at the time of manufacture, so that the circlip did not expand.  Larson believed that this improper coupling led to severe wear of the outboard axle splines, and that the

---

[4]Although Honda refers to Kubly's report as Exhibit J in its statement of undisputed facts, there is no Exhibit J, and no report by Kubly for the Court to review.

[5] Johnson has moved in limine to preclude Honda from introducing evidence regarding Fowler's testing.  That motion is addressed below.

metal on metal contact of the two rough surfaces caused a difficult and unpredictable steering response in the ATV.

Honda nonetheless argues that Larson's opinion is not sufficient to raise a genuine issue of material fact as to causation because he admitted at his deposition that he did not evaluate whether the steering condition he identified actually caused the accident. As Larson's deposition testimony reflects, his assignment was not to determine what caused the accident, but to look at "the mechanical portion of this case, specifically the ATV, and try to discover if there were any problems, issues that may have contributed to difficult steering as reported." Dkt. 50-8, at 4. Larson did just that, and concluded that improper assembly of the right front axle had likely caused a steering problem. Whether the allegedly defective steering condition Larson identified actually caused Johnson to drive off the road and crash will be for the jury to determine after weighing the evidence and the credibility of the witnesses.

In what amounts to a *Daubert* challenge, Honda maintains that Larson's opinion is not reliable because he has admitted that he did not attempt to recreate the steering condition Johnson described. At his deposition, Larson conceded that he had not done any testing on an exemplar ATV, and had not done anything to demonstrate or quantify the difficult and unpredictable steering response he

identified. Dkt. 50-8. As discussed below, however, Larson's failure to conduct such testing goes to the weight of his expert testimony, not its admissibility.

Finally, Honda argues that even accepting Larson's opinion as set forth in his report, the steering problem that he identified could not have caused the accident because it is not consistent with the steering problem Johnson described. As Johnson described it during his deposition, the steering on the ATV "locked up" just as he was getting ready to make the right hand turn, and he was unable to move the handlebars more than approximately an eighth of an inch in either direction. Dkt. 50-1, at 8-9. Honda argues that Johnson's description of what happened is inconsistent with the steering response predicted by Larson.

As Honda notes, Larson predicted that the ATV's damaged right side axle shaft would have provided "intermittent and difficult steering response when the operator exerted turning force through the steering bar assembly," and found that "[t]his force would be especially apparent at large turning angles and negligible while traveling in a straight path." Dkt. 50-7, at 1. Honda argues that Larson's description, which characterizes the difficult steering response as "negligible while traveling in a straight path," does not match Johnson's description, which was that he found himself unable to steer the ATV while traveling in a straight path. According to Honda, then, there is no way that the steering problem Larson

identified could have caused the accident.

At this juncture, however, the Court cannot say as a matter of law that Larson's report is necessarily incompatible with Johnson's description of what happened. Johnson reported difficulty steering when he attempted to execute a right hand turn. This is arguably consistent with Larson's conclusion as set forth in his report, which was that someone operating the ATV would experience an intermittent and difficult steering response when exerting turning force through the steering bar. Elsewhere in his report Larson describes the steering problem in more detail as follows:

> [A]ny turn would introduce the wear-inducing rotational speed differences between axle and CV joint, with associated grinding, lurching, and binding. The larger the turn angle, the greater the rotational speed difference and the greater the grinding of the shafts.
>
> Feedback to the operator would be intermittent as the incorrectly mated parts wore down, but in general the problem would be expressed as negative steering feedback during any turn as the right wheel and right axle shaft turned at different rotational speeds, most severe at higher turning angles. Simply stated, the ATV would feel as though it wanted to go straight.
>
> Dkt. 50-6, at 8.

Whether Larson believes "the ATV would feel as though it wanted to go straight" so much so that the steering might feel "locked" as Johnson described it, is simply not clear from the face of Larson's report or the deposition excerpts

submitted on summary judgment.  At trial, Johnson will presumably testify and describe the steering difficulty he claims to have experienced immediately before the accident.  Larson will likewise testify as to the steering problems he has concluded were likely caused by improper assembly of the right front axle.  It will be for the jury to evaluate the credibility of that testimony, decide how much weight to give to Larson's opinion, and determine whether the allegedly defective steering condition Larson identified actually caused Johnson to drive off the road and crash.

Because of the various factual issues discussed above, Honda is not entitled to summary judgment on Johnson's manufacturing defect claim.

2.    Design Defect

Johnson also seeks to recover against Honda under the theory of strict liability for defective design.  Dkt. 9, at 2-3.  Unlike a manufacturing defect, "a design defect is one which 'presents an unreasonable risk of harm, notwithstanding that it was meticulously made according to [the] detailed plans and specification' of the manufacturer."  *Rix v. General Motors Corp.*, 723 P.2d 195, 200 (Mont. 1986) (quoting *Caprara v. Chrysler Corp.*, 417 N.E.2d 545, 552-53 (N.Y. 1981)). In other words, design defects involve products that "are made in precise conformity with the manufacturer's design but nevertheless result in injury

to the user because the design itself was improper."  *Rix*, 723 P.2d at 200 (quoting *Caprara*, 417 N.E.2d at 552-53).

A design is improper or "defective if at the time of manufacture an alternative designed product would have been safer than the original designed product and was both technologically feasible and a marketable reality."  *Krueger v. General Motors Corp.*, 783 P.2d 1340, 1345 (Mont. 1989) (quoting *Rix* 723 P.2d at 202) (emphasis omitted).  This means that "evidence of alternative designs available prior to manufacture" are "not only relevant, but necessary" to such a products liability claim.  *Preston v. Montana Eighteenth Judicial Dist. Court, Gallatin County*, 936 P.2d 814, 820 (Mont. 1997).

Honda argues it is entitled to summary judgment because Johnson has failed to even allege a proper basis for a design defect claim, and has not presented any evidence of a proposed alternative design.  Honda is correct on both fronts.[6]

Johnson's strict liability claim alleges that Honda owed him "a duty of care in the design...of the ATV in question" and that a "defect in the design" was "a producing cause of [his] injuries and damages."  Dkt. 9, at 2-3.  But the only

---

[6] Honda also argues that Johnson's "design defect claim fails because it is premised on the same alleged defect that has been disproven by the uncontested physical evidence."  Dkt. 49, at 13.  As discussed above, however, there are genuine issues of material fact as to whether the ATV was defective as alleged.

factual basis provided in the Amended Complaint to support all of Johnson's strict liability claims, including his design defect claim, is that "[t]he ATV was defective in that during assembly an expandable clip that should have locked the right side front axle to the CV joint during assembly had not been properly assembled," or "failed", thereby "resulting in a defective condition." Dkt. 9, at ¶¶ 8-9. These allegations may plead a manufacturing defect, but they do not identify any alleged design defect.

Furthermore, Johnson has not come forward in response to Honda's summary judgment motion with any evidence of alternative designs. Nor has he provided any expert opinions in support of his ostensible design defect claim. Johnson's only argument in response to Honda's motion is that he "is not required to provide an alternative design." Dkt. 61, at 6. Johnson takes the position that "[t]he properly assembled design is sufficient to meet any obligation that [he] must prove regarding the ability of Honda to produce a working design." Dkt. 61, at 6. But Johnson does not cite any authority for the proposition that he is not required to produce evidence of a safer alternative design. Even more fundamentally, Johnson does not point to any evidence suggesting that the ATV's design specifications were in any way defective. Johnson's design defect claim thus fails as a matter of law.

### 3.     Breach of Warranty

Johnson's Amended Complaint includes a claim for breach of express warranty. Dkt. 9, ¶¶ 18-21. Johnson alleges that because of the ATV's assembly defect, the vehicle failed to conform to the manufacturer's express warranty. Dkt. 9, ¶¶ 18-21. Honda moves for summary judgment on this claim as well. Honda's sole supporting argument is that because "the uncontested evidence provides that the axle shaft was properly assembled at the time of manufacture," Johnson "cannot prove a breach of warranty claim on this basis." Dkt. 49, at 16. As discussed above, however, there are genuine issues of material fact precluding summary judgment on Johnson's manufacturing defect claim. Because Johnson's manufacturing defect claim survives, so too does his claim for breach of express warranty.

### 4.     Admissibility of Expert Opinion

Alternatively, Honda argues it is entitled to summary judgment as to Johnson's claims because Larson's expert opinions are inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Fed. R. Evid. 702 provides that expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to

understand the evidence or to determine a fact in issue"; the witness is qualified

"by knowledge, skill, experience, training, or education"; and "(1) the testimony is

based upon sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has applied the principles and methods

reliably to the facts of the case." The court acts as a "gatekeeper", and must

ensure that expert testimony is both reliable and relevant. *Daubert*, 509 U.S. at

589. This gatekeeping role entails making "a preliminary assessment of whether

the reasoning or methodology underlying the testimony is scientifically valid," and

"whether that reasoning or methodology properly can be applied to the facts in

issue." *Daubert*, 509 U.S. at 592-93.

     In assessing the reasoning or methodology used, the court may consider

"such criteria as testability, publication in peer reviewed literature, and general

acceptance." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)(citing *Daubert*,

509 U.S. at 592-94). The court's inquiry is a flexible one, however, and these

specific criteria do not necessarily apply "to all experts or in every case."

*Primiano*, 598 F.3d at 564 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

141 (1999)). "Shaky but admissible evidence is to be attacked by cross

examination, contrary evidence, and attention to the burden of proof, not

exclusion." *Primiano*, 598 F.3d at 564. Whether to admit or exclude expert

testimony is within the court's discretion. *Kumho Tire Co.*, 526 U.S. at 152.

Honda does not dispute the relevancy of Larson's opinion, and does not argue that he lacks the qualifications or experience to testify as an expert. Rather, Honda challenges the reliability of Larson's opinion and his conclusion that "the front right axle shaft of the Honda TRX 420 ATV in question was improperly assembled, and that this led directly to the wear of the axle and the difficult steering condition that was reported by the plaintiff in this case." Dkt. 50-7, at 1. Honda argues that Larson's opinion can be broken down into four parts, or sub-opinions, each of which is "based on nothing more than assumption and speculation": (1) that the wear marks on the right front axle were abnormal and severe; (2) that those wear marks indicated improper assembly of the axle; (3) that improper assembly of the axle caused the difficult steering response Johnson described, and; (4) that the steering condition may have been a contributing factor to the accident. Dkt. 49, at 18.

With regard to the first of these four sub-opinions, Honda maintains that Larson's description of the wear marks on the axle as "abnormal" or "severe" is not supported by any scientific evaluation or testing. As Honda notes, for example, Larson's deposition testimony reflects that he did not specifically quantify the amount of wear he observed, did not quantify how much rotation

would be required to produce that amount of damage, and did not compare the wear marks to properly inserted exemplar axle shafts. Dkt. 50-8, at 9-11.

Larson did, however, base his assessment on a physical examination of the ATV and its component parts. Larson examined the axle shaft and visually compared the damaged right end to the undamaged left end. Larson also compared the damaged axle shaft to other, undamaged component parts of the ATV, noting "the relative relationship of the wear patterns to other components, specifically the CV joint." Dkt. 50-8, at 9. In addition, Larson visually compared the damaged axle shaft with internet photographs of undamaged axle shafts. While Honda has pointed to several legitimate and potentially persuasive grounds for cross-examination, Larson's opinion as to the general nature of the wear marks on the axle is sufficiently supported by his physical examination of the ATV's axle and other component parts to be admissible.

Honda also challenges Larson's second conclusion, which is that the axle shaft was improperly assembled. In particular, Honda points out that when Larson examined the interior recess of the constant velocity joint that would have permitted the circlip to expand when the axle was fully inserted, there were no marks visible. Dkt. 50-6. But because the lack of marks could have been due to the extreme hardness of those internal splines, Larson called those particular

results inconclusive. Dkt. 50-6. Larson nonetheless concluded based on his other findings that it was likely the axle "had not been properly installed at the time of assembly." Dkt. 50-6, at 12. He did so after conducting testing to rule out other explanations for the wear marks on the axle shaft, and based on his examination of the axle shaft and other component parts. Dkt. 50-6, at 8-20. Dkt. 50-8, at 12. Larson's opinion is sufficiently reliable to be presented to the jury, at which point Larson will be subject to full cross-examination.

As broken down by Honda, Larson's third sub-opinion is that "[t]he condition that caused the severe wear and deformation would also result in difficult and unpredictable steering response." Dkt. 50-6, at 4; Dkt. 50-8, at 16. Honda argues this opinion is without any scientific basis because Larson did not (1) try to recreate a scenario where he was able to lock the handlebars in a straight direction; (2) re-insert the ATV's axle or an exemplar axle into the vehicle to determine if it would result in stiff or unpredictable steering; (3) perform any testing on an exemplar ATV; (4) analyze the ATV's service records; (5) specify when the axle shaft became entirely separated from the ATV; or (6) perform an accident reconstruction. Dkt. 49, at 22; Dkt. 50-8, at 16-17.

While these points may be the proper subject of cross-examination, they do not make Larson's opinion so unreliable as to be inadmissible. Larson physically

examined the ATV and its component parts, performed various tests on those component parts, and applied his mechanical engineering knowledge and specific expertise in concluding that improper coupling of the right front axle shaft and constant velocity joint caused severe wear and deformation and also caused a difficult and unpredictable steering response.

Honda also challenges the reliability of Larson's opinion as to the nature of the steering condition on the ground that it is inconsistent with Johnson's description of the steering difficulty he experienced. As discussed above, however, the Court cannot make that determination as a matter of law based on the record as it now stands. And in any event, whether Larson's opinion is consistent with Johnson's deposition testimony has nothing to do with its scientific reliability.

Finally, Honda argues there is no scientific basis for Larson's fourth sub-opinion, which is that the "condition of difficult, unpredictable steering was a likely substantial contributing factor in the accident." Dkt. 49, at 23; Dkt. 50-6, at 4. On this point, Honda is correct. By his own admission, Larson did not reconstruct the accident and did not investigate or attempt to identify the cause of the accident. As Larson described it, his "main assignment was to look at the mechanics, the mechanical portion of this case, specifically the ATV, and try to

discover if there were any problems, issues that may have contributed to difficult steering as reported."  Dkt. 50-8, at 4-5. Although Larson's opinion on the "mechanical portion" of the case is sufficiently reliable to be presented to the jury subject to cross examination, Larson cannot testify as to whether or not the alleged steering condition actually caused Johnson to drive off the road.  With the exception of this sub-opinion, Honda's motion for summary judgment is denied for the reasons set forth above.

### 5.    Attorney Fees

Johnson characterizes Honda's summary judgment motion as "frivolous" and asks the Court to award him the attorney fees he has incurred in responding to the motion.  Dkt. 61, at 10.  Honda's motion was hardly frivolous, however, and Johnson's request for fees is denied accordingly.

## III.    **Johnson's Motions in Limine**

Johnson moves in limine to preclude Honda from presenting any evidence or argument relating to the following: (1) exemplar testing performed by defense expert Graeme Fowler; (2) the fact that Johnson was not wearing a helmet at the time of the accident; (3) non-disclosed expert opinions, and; (4) attribution of fault to non-parties.

"To exclude evidence on a motion in limine 'the evidence must be

inadmissible on all potential grounds.'" *Wood v. Mt. Dept. of Revenue*, 2011 WL

4348301 *2 (D. Mont. Sept. 16, 2011) (quoting *BNSF Ry. v. Quad City Testing*

*Laboratory, Inc.*, 2010 WL 4337827 (D. Mont. Oct. 26, 2010)). "Unless evidence

meets this high standard, evidentiary rulings should be deferred until trial so that

questions of foundation, relevancy and potential prejudice may be resolved in

proper context." *Id.*

A.    **Exemplar Testing**

Mechanical engineer Graeme Fowler performed an investigation of the

technical issues involved in this case, and prepared a written report. Dkt. 50-10.

As part of that investigation, Fowler tested an exemplar ATV for the purpose of

evaluating Larson's opinion that Johnson's ATV had developed steering problems

because of an improperly assembled axle shaft. Fowler conducted two different

tests, the first of which involved operating the exemplar ATV "with the front right

output shaft circlip removed." Dkt. 50-10, at 18. Before operating the ATV,

Fowler glass beaded the outboard shaft splines "so as to allow the shaft to move

freely in the female splines of the CV joint inner race." Dkt. 50-10, at 18. The

inboard constant velocity boot was then "installed correctly while the outboard

boot was cut and attached to the shaft to approximate the condition observed after

the accident." Dkt. 50-10, at 18. The ATV was then operated in that condition for

a total of 18 miles on a "relatively windy and rough dirt road," and for an additional 4.4 miles on an "asphalt skid pad utilizing a wide range of steering inputs." Dkt. 50-10, at 18. This demonstration indicated that the axle shaft stayed in "approximately the same lateral position" and while the "shaft did not quite seat to the full extent as if the circlip was installed," it "did not have a tendency to migrate inboard during the 18 miles of operation." Dkt. 50-10, at 18-19.

A second riding demonstration was conducted using an exemplar output shaft that was machined "to approximate the condition of the accident shaft." Dkt. 50-10, at 19. The modified shaft was installed in the ATV "with the inboard boot properly attached and the outboard boot cut and attached to the shaft to approximate the condition of the accident shaft." Dkt. 50-10, at 19. The ATV was then operated for a total of 15.6 miles on an off-road riding course, during which time "the steering response of the vehicle was unaffected by the condition of the output shaft...." Dkt. 50-10, at 19. Dkt. 50-10, at 20.

Fowler concluded that "with the end of the output shaft in the post-accident condition and still inserted in the inner race of a functioning outboard CV joint," his testing had "demonstrated that the shaft would remain in the joint and not affect the steering or control of the ATV." Dkt. 50-10.

Johnson characterizes Fowler's tests as accident reconstructions, and argues

that such evidence is not admissible under Fed. R. Evid. 403 unless there is a

foundational showing that those reconstructions were substantially similar to his

actual accident.[7]  If a test or demonstration is performed for purposes of recreating

or simulating an accident, federal courts generally require that the proponent

establish substantial similarity between the test or demonstration and the accident

conditions.  See e.g.  *Muth v. Ford Motor Co.*, 461 F.3d 557, 566 (5th Cir. 2006);

*McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1401 (8th Cir. 1994); *Fusco v.*

*General Motors Corp.*, 11 F.3d 259, 264 (1st Cir. 1993).

Johnson maintains that Honda cannot make the requisite foundational

showing because the tests Fowler performed were significantly different from the

actual accident.  As Johnson notes, for example, his ATV had approximately 1,000

miles on it at the time of the accident but the exemplar ATV was only driven 18

miles during the first test, and 16 miles during the second.  Johnson also contends

that although the exemplar axle shafts were ground down, they retained distinctive

splines and were not as worn down and smooth as was the axle on his own ATV.

Finally, Johnson argues that unlike the constant velocity joint on his own ATV,

---

[7] Although Johnson cites two Montana Supreme Court decisions for the
proposition that accident recreations are only admissible if they are substantially
similar to the accident experienced by the plaintiff, evidentiary issues like these
are controlled by the Federal Rules of Evidence and federal caselaw.

the constant velocity joint on the exemplar ATV did not contain any metallic

spline fragments and was therefore free to move in its intended way.   In light of

these differences, Johnson argues the probative value of evidence relating to

Fowler's exemplar testing is substantially outweighed by the danger of unfair

prejudice, confusing the issues, or misleading the jury.

Honda does not attempt to establish substantial similarity between Fowler's

exemplar testing and Johnson's accident.  Instead, Honda argues that the

substantial similarity requirement is wholly inapplicable because Fowler's tests

were designed to demonstrate scientific and mechanical principles, not to recreate

or simulate the accident.

If tests or experiments are not designed to recreate the actual accident, but

are instead "used to demonstrate only general scientific principles," a foundational

showing of substantial similarity is not required.  *McKnight*, 36 F.3d at 1401.  Of

course, "[e]xperimental evidence falls on a spectrum," and distinguishing between

tests that purport to recreate an accident and those that simply demonstrate

scientific principles is often difficult.  *McKnight*, 36 F.3d at 1402.

The Court agrees with Honda that to the extent Fowler used the tests to

investigate whether an improperly assembled axle shaft would have an effect on

steering and to demonstrate the scientific principles involved, the tests do not

appear to recreate the accident. So cabined, Fowler's tests are admissible under Rule 403 without a foundational showing of substantial similarity.

As discussed above, Johnson's expert, Robert Larson, concluded based on his examination of the right front axle and constant-velocity joint that the metal on metal contact between the rough surfaces of the axle and joint would cause a difficult and unpredictable steering response in the ATV. Honda's expert Fowler reaches a different conclusion based in part upon his exemplar testing.

It is entirely legitimate for Honda to present evidence in its defense regarding the effect of the alleged manufacturing defect on the vehicle's steering. The fact that Fowler conducted the exemplar testing to assess whether metal on metal contact between the surfaces of the exemplar axle and joint would impact the steering of the ATV does not turn his testing into a reconstruction of what occurred at the time of the accident. And Johnson is free to challenge the validity of Fowler's testing and conclusions through rigorous cross-examination.

The Court is satisfied that the jury will not be confused and somehow believe that Fowler's tests were meant to show what probably happened during the accident. Any risk of jury confusion can be alleviated by giving a limiting instruction making clear that the evidence of Fowler's exemplar testing – just like Larson's evaluation – was not meant to reconstruct Johnson's accident. *See e.g.*

*McNight*, 36 F.3d at 1403 n.6. Therefore, Johnson's motion in limine is denied to the extent it seeks to exclude evidence of Fowler's exemplar testing as that testing bears upon the issue of whether the alleged defect could lead to difficulty steering.

Fowler does not, however, limit his opinion to the issue of whether the alleged defect would impact steering. Instead, he goes on to express opinions regarding the risk of ATV use and ultimately opines that Johnson's accident was the result of operator error – not a product defect. In doing so, Fowler obviously does undertake to recreate the accident by explaining what he believes actually caused Johnson to crash. These opinions run afoul of Rule 403 because the requisite "substantial similarity" between the exemplar axle shaft and the subject axle shaft is lacking. Therefore, Johnson's motion is granted to the extent Fowler will not be allowed to express his opinion as to the risk of ATV use and the cause of Johnson's accident.

## B.    Helmet Non-Use

In Montana, contributory negligence is not a defense to a strict product liability claim, with the exception that a defendant may assert the affirmative defenses of assumption of the risk and misuse as codified at Mont. Code Ann. § 27-1-719. Johnson moves to preclude any evidence or argument relating to the fact that he was not wearing a helmet at the time of the accident on the ground that

it is not admissible to prove either of these affirmative defenses.

1.  Misuse

To prevail on a product misuse defense, the defendant must prove that "[t]he product was unreasonably misused by the user or consumer and the misuse caused or contributed to the injury." Mont. Code Ann. § 27-1-719(5)(b). As defined by the Montana Supreme Court, the misuse defense is one pursuant to which "a manufacturer is not responsible for injuries resulting from abnormal or unintended use of a product if such use was not reasonably foreseeable." *Hart-Albin Co. v. McLees Inc.*, 870 P.2d 51, 53 (Mont. 1994). This definition "incorporates the concept of abnormal or unintended use, but emphasizes unforeseeability." *Hart-Albin Co.*, 870 P.2d at 54.

The "statute clearly contemplates that manufacturers must expect, or, stated another way, must reasonably foresee, that their products will not always be used in precisely the manner for which they were designed or constructed." *Lutz v. National Crane Corp.*, 884 P.2d 455, 459 (Mont. 1994). If the manufacturer expects or "reasonably foresees that its product is or will be subject to misuse in a certain fashion, then the fact that the user of the product actually does use – or, in the words of the statute, misuse – the product in that fashion can hardly be said to be 'unreasonable'." *Lutz*, 884 P.2d at 460. In other words, "reasonably

foreseeable misuse is reasonable misuse." *Lutz*, 884 P.2d at 460. If the "offending misuse" was reasonable, then the defense of misuse is not available. *Lutz*, 884 P.2d at 460.

Johnson argues that his failure to wear a helmet while operating the ATV was reasonably foreseeable, and did not constitute an "unreasonable misuse" of the product. The Court agrees. As Johnson notes, Montana law does not require a person of majority age to wear a helmet while operating a "quadricyle."[8] Particularly in light of the fact that helmet use is not legally required in this state, an ATV manufacturer can expect, or reasonably foresee, that some Montanans will operate their ATVs without wearing helmets. While doing so may be a misuse, it is not an "unreasonable misuse." Because an ATV manufacturer can reasonably foresee that its product will be misused in this fashion – i.e., by a driver who does not wear a helmet – the defense of misuse is not available. *Lutz*, 884 P.2d at 460-61.

In an attempt to convince the Court differently, Honda argues that it was an "unreasonable misuse" for Johnson to operate the ATV without a helmet in light

---

[8] A "quadricycle" is statutorily defined as a "four-wheeled motor vehicle, designed for on-road or off-road use, having a seat or saddle upon which the operator sits and a motor capable for producing not more than 50 horsepower." Mont. Code Ann. § 61-1-101-(53)(a). There is no dispute that the ATV at issue here qualifies as a "quadricycle."

of on-product instructions to "always wear a helmet" and warnings regarding the risks of unhelmeted operation. Dkt. 43, at 7. To support this argument, Honda relies on an Arizona statute providing, in part, that a defendant in a product liability action shall not be liable if it proves that the plaintiff's use of the product "was contrary to any express and adequate instructions or warnings appearing on or attached to the product...." *Kavanaugh v. Kavanaugh*, 641 P.2d 258, 262 (Ariz. App. 1981) (citing A.R.S. § 12-683). But Montana has no such statute. The fact that the *Lutz* court cited *Kavanaugh* in passing to make an unrelated point does not somehow suggest that the Montana Supreme Court would usurp the role of Montana's legislature and adopt a rule set forth in an Arizona statute.

In Montana, the defense of misuse is not available if the manufacturer can reasonably foresee that its product will be misused in a certain fashion. Particularly where state law does not require the use of a helmet, an ATV manufacturer can reasonably foresee that its product will be misused by drivers who do not wear helmets. The fact that Honda included instructions and warnings in an attempt to guard against that type of misuse does not make it unforeseeable. If anything, the fact that Honda saw fit to include those instructions and warnings underscores how foreseeable it is that a person might operate an ATV without a helmet.

### 2. Assumption of the Risk

Johnson also argues that Honda should not be allowed to introduce evidence of helmet non-use in support of its assumption of the risk defense. To prevail on an assumption of the risk defense, a defendant bears the burden of proving that "[t]he user or consumer of the product discovered the defect or the defect was open and obvious and the user or consumer unreasonably made use of the product and was injured by it." Mont. Code Ann. § 27-1-719(5)(a).

As applied in a strict liability case, the defense of assumption of the risk "involves *unreasonable* exposure to the danger created by the defective product." *Zahrte v. Sturm, Ruger & Co., Inc.*, 661 P.2d 17, 18 (Mont. 1983) (emphasis in original). A "[p]laintiff must have subjective knowledge of the danger and then voluntarily and unreasonably expose himself to that danger before assumption of the risk will become operative in a strict liability case." *Zahrte*, 661 P.2d at 18-19. This assumption of the risk defense "must be applied in accordance with the principles of comparative negligence set forth in 27-1-702." Mont. Code Ann. § 27-1-719(6); *Lutz*, 884 P.2d at 460.

Focusing on the fact that assumption of the risk is analyzed under a subjective standard that considers "what the particular plaintiff sees, knows,

understands, and appreciates,"[9] Honda points out that Johnson has admitted to having read and understood the warnings on the ATV. Dkt. 43-3, at 4-5. Honda maintains that evidence that Johnson ignored those warnings and operated the ATV without a helmet on the day of the accident is admissible because it demonstrates that he voluntarily and unreasonably exposed himself to a known danger.

But whether Johnson assumed the risk of riding an ATV without a helmet on the day of the accident, thereby exposing himself to the known dangers associated with doing so, is not the relevant inquiry. As the statutory language of this affirmative defense reflects, the relevant inquiry is whether Johnson knew of the alleged defect in the ATV – the improperly assembled axle – and unreasonably made use of the ATV. Mont. Code Ann. § 27-1-719(5)(a). In other words, to prevail on its assumption of the risk defense, Honda must show two things: (1) that Johnson "discovered the defect or the defect was open and obvious," and (2) that Johnson "unreasonably made use of the product." *Lutz*, 884 P.2d at 461.

Evidence that Johnson was not wearing a helmet at the time of the accident has nothing to do with whether or not Johnson had discovered the alleged manufacturing defect or whether that defect was open and obvious. Nor is it

---

[9] *Lutz*, 884 P.2d at 461.

admissible to show that Johnson "unreasonably made use of" the ATV.   As

discussed above, foreseeability is critical when it comes to determining whether a

consumer's use of a product is reasonable or unreasonable.  *Lutz*, 884 P.2d at 462

(noting that where plaintiff's use of the product was foreseeable, "the second part

of the defense of assumption of the risk could not, as a matter of law, be proven

under the statute").  Because Honda could reasonably foresee that its ATVs would

be operated by unhelmeted operators, Honda cannot show that Johnson

"unreasonably made use of" the ATV by not wearing a helmet.  Thus, evidence

that Johnson was not wearing a helmet on the day of the accident is not admissible

for purposes of establishing assumption of the risk in this product liability action.

### 3.   Causation

In a final attempt to defeat Johnson's motion in limine, Honda takes the

position that evidence of his "helmet non-use is admissible on causation issues."

Dkt. 43, at 9.  Honda first argues that Johnson's conduct in failing to wear a

helmet was a superseding cause of his injuries.  Honda begins by citing *Rost v.

C.F.& I. Steel Corp.,* 616 P.2d 383, 386 (Mont. 1980) for the proposition that "a

manufacturer is not liable where the product owner's [conduct] is the superseding

cause of the plaintiff's injuries."  The *Rost* court identified the product "owner's

knowledge and ability to prevent the danger" as one factor that "may operate to

break the necessary causal chain." *Rost*, 616 P.2d at 386.

Honda points to the fact that Johnson knew of the on-product warnings and instructions but nonetheless operated the ATV without wearing a helmet. Honda's medical expert, Dr. Harry Smith, has indicated that if Johnson had been wearing a helmet, the helmet "would have protected his head from impacts and would have significantly mitigated if not completely eliminated any alleged brain injury that he did receive by being unhelmeted." Dkt. 43-1, at 9. Citing Dr. Smith's opinion, Honda maintains that Johnson's conduct in failing to wear a helmet was a superseding cause of his injuries, and argues that evidence of his conduct in that regard is therefore admissible to show that the alleged product defect was not the proximate cause of his injuries.

But the *Rost* case on which Honda relies is distinguishable. The plaintiffs in that case were injured after a cable failed and the store elevator in which they were riding fell. *Rost*, 616 P.2d at 385. The plaintiffs brought a strict product liability action against the manufacturer of the elevator cable. *Rost*, 616 P.2d at 385. The Montana Supreme Court concluded that the manufacturer's failure to warn of the dangerous use of its cable was not the proximate cause of the accident, because the store owner's conduct in failing to maintain and inspect the elevator was a superseding intervening cause. *Rost*, 616 P.2d at 387.

Unlike *Rost*, the product owner in this case is the injured plaintiff. While

*Rost* recognized that a third-party product owner's conduct may operate as a

superseding intervening cause to relieve the manufacturer of liability, it said

nothing about the propriety of introducing evidence of an injured plaintiff's

comparative fault in a strict product liability action.  Except as provided for by

Mont. Code Ann. § 27-1-719(5), evidence of a plaintiff's contributory negligence

has no place in a strict product liability case like this one.  See e.g., *Lutz*, 884 P.2d

at 461 (rejecting defendant's "efforts to interject negligence concepts" into the

case); *Bell v. Glock*, 92 F.Supp.2d 1067,1070 (D. Mont. 2000) (citing *Lutz* and

concluding that "the defenses of intervening and superseding cause are not proper

defenses" in a strict product liability case).  Honda's superseding intervening

cause argument is nothing more than an improper attempt to inject comparative

negligence principles into this strict product liability action.

Even if it were permissible for Honda to argue that Johnson's own conduct

was a superseding intervening cause, the argument fails on the merits.  A

superseding intervening cause must be one that is not reasonably foreseeable to

the defendant.  *See e.g.*, *Thayer v.  Hicks*, 793 P.2d 784, 795 (1990) (stating that

"[a] defendant's liability for his wrongful act will not be severed by an intervening

cause if the intervening cause is one that the defendant might reasonably foresee

as probable or one that the defendant might reasonably anticipate under the circumstances."). Johnson's conduct in not wearing a helmet simply did not play any role in causing the accident. Even if it could be argued that it did, Johnson's conduct was foreseeable. As discussed above, an ATV manufacturer like Honda can reasonably foresee that its product will be operated by unhelmeted drivers. Because Johnson's failure to wear a helmet was reasonably foreseeable and did not cause the accident, it cannot be considered a superseding intervening cause.

Finally, Honda maintains that although Johnson claims to have suffered a traumatic brain injury in the accident, "there is no record of any physical manifestation of head injury, such as head lacerations or contusions." Dkt. 43, at 10. Honda claims it should be allowed to argue that since Johnson was not wearing a helmet, if he had in fact "suffered a traumatic head injury there should have been have been some physical manifestation of a blunt head impact." Dkt. 43, at 10-11.

Once again, this argument is an improper attempt on Honda's part to make contributory negligence a part of this case. As discussed above, the fact that Johnson was not wearing a helmet is not admissible for purposes of an assumption of the risk or product misuse defense. Those two defenses provide the only vehicle by which a defendant in a strict product liability can introduce evidence of

a plaintiff's contributory negligence. Mont. Code. Ann. § 27-1-719(5).

Honda is still free to defend against Johnson's claim that he suffered a traumatic head injury by pointing to the lack of any physical manifestation of a blunt head impact. While Honda fears the jury might infer from the lack of visible trauma that Johnson was wearing a helmet, it is equally possible that the jury would expect Johnson to come forward and explain that the reason he did not have any visible trauma was because he was wearing a helmet. When Johnson does not do so, the jury could well infer that he was not in fact wearing a helmet.

Even if it were permissible for Honda to introduce negligence concepts into this strict product liability case, evidence that Johnson was not wearing a helmet would still be inadmissible. The Montana Supreme Court has held that where the use of a helmet is not required by law, "the failure to wear a helmet ordinarily does not constitute negligence." *Walden v. State*, 818 P.2d 1190, 1196 (Mont. 1991). In making that determination, the *Walden* court looked to the case of *Kopischke v. First Continental Corp.*, 610 P.2d 668 (Mont. 1980) for guidance.

*Kopischke* was decided before the state legislature passed a law requiring the use of seatbelts in automobiles. *Kopischke*, 610 P.2d at 679. At issue in *Kopischke* was whether the defendant could offer evidence that the plaintiff had contributed to her own injuries and damages by not wearing a seatbelt. *Kopischke*,

610 P.2d at 679.  In declining to recognize a common law duty to wear a seatbelt, the *Kopischke* court reasoned "that to adopt a seat belt defense when the legislature ha[d] failed to do so would be ill-advised."  *Kopischke*, 610 P.2d at 683.  Drawing on *Kopischke*, the *Walden* court held that because the use of a bicycle helmet was not required by law, evidence that the plaintiff was not wearing a helmet at the time of the accident did not constitute negligence and "was not admissible on the question of damages."  *Walden*, 818 P.2d at 1197.

Here, as in *Walden*, Johnson was not required by law to wear a helmet while operating his ATV.  Absent such a statutory requirement, Johnson's failure to wear a helmet did not constitute negligence.  Under *Walden* and *Kopischke*, evidence that Johnson was not wearing a helmet when he crashed would be inadmissible for any purpose.

### C.    Non-Disclosed Expert Opinions

Johnson moves the Court to enter an order in limine precluding Honda from introducing testimony or evidence pertaining to expert opinions not properly disclosed in accordance with the deadline established by the Court for the disclosure of all expert testimony pertaining to the issue of liability.  The Scheduling Order entered in this matter on January 4, 2011 (Dkt. 15) established a deadline of August 1, 2011, for the disclosure of expert testimony pertaining to the

issue of liability. By order entered August 1, 2011 (Dkt. 26) the referenced deadline was extended to November 1, 2011, pursuant to agreement of the parties. Again, on October 31, 2011, and pursuant to agreement of the parties, the Court entered an order (Dkt. 33) granting Honda until November 11, 2011, to disclose its liability expert opinions. By notice filed November 11, 2011 (Dkt. 34), Honda advised the Court that it served Johnson with its "disclosure expert witnesses and expert reports."

Johnson does not dispute that he was served with Honda's Fed. R. Civ. P. 26(a)(B) reports by the November 11, 2011, deadline. Rather, he appears to argue that based on the deposition testimony of Honda's expert witness Graeme Fowler, the possibility exists that Honda may attempt to elicit undisclosed opinion testimony from Dr. Fowler at the time of trial. Honda retorts, in substance, that Dr. Fowler did not express any opinions at the time of his deposition that had not been disclosed in his November 11, 2011, Rule 26(a)(2)(B) report. Dkt. 81.

As the parties undoubtedly understand, any opinion testimony that was not disclosed in accordance with Rule 26(a)(2)(B) and the scheduling orders of the Court will not be allowed at trial. Therefore, Johnson's motion is denied as unnecessary. Obviously, if either party attempts to present what the adverse party can establish as undisclosed opinion testimony, or facts and data that were not

considered in forming a disclosed opinion, the Court will entertain a proper

objection.

**D.     Attribution of Fault to Non-Parties**

Johnson also moves to preclude Honda from presenting testimony or

evidence attributing liability to any non-party.  Honda represents in response that

it does not anticipate attempting to attribute liability to any non-party.  Dkt. 81, at

2.  Based on Honda's representation, this motion in limine is denied as moot.

**V.     Conclusion**

Accordingly,

IT IS ORDERED that Honda's Motion for Summary Judgment and

Johnson's Motions in Limine are GRANTED IN PART and DENIED IN PART as

set forth above.

DATED this 26th day of March, 2012

 /s/ Jeremiah C. Lynch_____
Jeremiah C. Lynch
United States Magistrate Judge