**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

_____

ZANE JOHNSON,                                    CV 10-126-M-JCL

          Plaintiff,

     vs.

                                  ORDER

AMERICAN HONDA MOTOR
COMPANY, INC.,

          Defendant.

_____

This products liability action comes before the Court on Defendant

American Honda Motor Company, Inc.'s ("Honda") post-trial motions to strike

expert testimony, for judgment as a matter of law, and for dispositive spoliation

sanctions.  For the reasons set forth below, Honda's motions to strike expert

testimony and for judgment as a matter of law are properly granted.

I.     **Background[1]**

In March 2007, Plaintiff Johnson purchased a four-wheeled, all-terrain

_____

[1] Because the parties are familiar with the facts and procedural history of
this case, what follows is only the briefest of background summaries.  The Court
will provide additional factual and procedural background as necessary in the
discussion section.

vehicle ("ATV") that had been manufactured, assembled, and designed by Honda. A few months later, Johnson was driving the ATV on a maintained forest road when he failed to negotiate a right-hand turn and crashed.

Johnson commenced this action against Honda in June 2010, alleging claims for strict products liability based on design and manufacturing defects, negligence, and breach of express warranty. Johnson subsequently amended his complaint to withdraw his negligence claim, and the Court dismissed his design defect claim on summary judgment.

A jury trial on Johnson's manufacturing defect and breach of express warranty claims began on October 22, 2012, and lasted for seven days. The Court dismissed Johnson's breach of express warranty claim before instructing the jury on October 31, 2012. The jury deliberated for the better part of five days on Johnson's sole remaining, manufacturing defect claim, but was unable to reach a verdict. The Court released the jurors without a verdict on November 6, 2012.

Consistent with the discussion had in open court that day, Honda has since moved to strike the trial testimony of Johnson's expert witness, and filed renewed motions for judgment as a matter of law and for sanctions based on the spoliation of evidence. Because it presents a case-dispositive threshold issue, the Court begins with Honda's motion to strike expert testimony.

-2-

## II.    Motion to Strike Expert Testimony

Johnson's liability expert, mechanical engineer Robb Larson, ultimately testified that a manufacturing defect – improper assembly of the ATV's right front axle shaft and constant velocity joint ("CV joint") – caused the ATV to exhibit a "difficult and unpredictable steering response."  Dkt. 243-2, at 61.   Honda now moves to strike Larson's testimony in its entirety or, alternatively, in its individual parts on the ground that it failed to meet the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[2]

Rule 702, which governs the use of expert testimony at trial, provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

For expert testimony to be admissible under Rule 702, it must satisfy three

---

[2] Honda objected to Larson's testimony on the same basis both before and during the trial, thereby preserving its right to raise the issue now and hereafter on appeal.

basic requirements: (1) the expert witness must be qualified; (2) the testimony must be reliable, and; (3) the testimony must be relevant. *Daubert*, 509 U.S. at 589-91.   The trial court is charged with acting as the "gatekeeper" for purposes of ensuring that these criteria are met. *Daubert*, 509 U.S. at 589.   As the proponent of Larson's testimony, Johnson bears the burden of establishing by a preponderance of the evidence that the requirements for admissibility have been satisfied. *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Honda maintains that Johnson has not met that burden here and challenges Larson's testimony on all three fronts.  First, Honda argues that Larson's general expertise in the area of  mechanical engineering did not qualify him to offer expert testimony regarding ATV operation, handling, and manufacturing, metallurgy, and forensic investigation. Second, Honda maintains that Larson's testimony was not reliable because he never tested or objectively validated his theory that improper assembly of the ATV's right front axle shaft and CV joint would have caused a difficult steering response.  Finally, Honda maintains that Larson's opinion was irrelevant because the difficult steering response he described was unlike the steering problem Johnson claimed to have experienced on the day of the accident – both earlier and at the precise time of the crash.

A.    Reliability

Assuming for present purposes that Larson was properly qualified to testify

as he did, the first question presented is whether Larson's testimony should

nonetheless be stricken because it was not sufficiently reliable.

Assessing reliability requires a court to consider whether the expert's

testimony reflected "scientific knowledge," whether his findings were "derived by

the scientific method," and whether his work product was "good science." *Pooshs*

*v. Phillip Morris USA, Inc.*, — F.R.D. —, 2012 WL 6044839 *1 (N.D. Cal. 2012)

(*quoting Daubert*, 509 U.S. at 590 & n. 9, 593).  In making this inquiry, the court

focuses not on "'the correctness of the expert's conclusions but [on] the soundness

of his methodology...'" *Barabin v. AstenJohnson, Inc.*, 700 F.3d 428, 431 (9th Cir.

2012) (*quoting Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)).  In other

words, the evidentiary reliability of expert testimony is based on its scientific

validity.  *Barabin*, 700 F.3d at 432 (*quoting Daubert*, 590 U.S. at 590 n. 9).  "An

expert's testimony must be grounded in the methods and procedures of science,

and must be more than unsupported speculation or subjective belief."  *U.S. v. W.R.*

*Grace*, 455 F.Supp.2d 1181, 1187 (D. Mont. 2006) (*citing Daubert*, 509 U.S. 579).

Ultimately, then, the "court is charged with determining whether the proffered

expert testimony is trustworthy." *Barabin*, 700 F.3d at 432.

Under Rule 702, a court evaluating the reliability of expert testimony must consider whether: (1) the testimony was based on sufficient facts or data, (2) the testimony was the product of reliable principles and methods, and (3) the witness applied those principles and methods reliably to the facts of the case.   Fed. R. Evid. 702.   The court may also consider the following non-exhaustive list of factors when assessing the reliability of an expert's reasoning and methodology: "(1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community." *Barabin*, 700 F.3d at 431 (*quoting Mukhtar v. California State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002)).

Other considerations may "include whether an expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion" and whether "there is simply too great an analytical gap between the data and the opinion proffered." *Pooshs*, 2012 WL 6044839 *2 (*citing General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Honda argues that Larson's testimony did not meet any of the reliability

requirements set forth in Rule 702 because his opinion was not based on sufficient facts or data, his reasoning and methodology were flawed, and he did not apply his principles and methods reliably to the facts of the case.  Honda's primary, overarching, and most compelling complaint is that Larson simply did not test or objectively validate his hypothesis, which was that the alleged improper assembly of the ATV's right front axle shaft and CV joint caused a "difficult and unpredictable" steering response in Johnson's ATV.

The post-trial record indeed reflects that Larson failed to conduct any testing to verify or quantify such a steering response.  Larson admitted as much during his testimony, as reflected in the following exchange on cross-examination:

Q:  And what you didn't do here is any testing to get any objective data of what you are claiming to be difficult or unpredictable steering.  You just didn't do that.  Correct?

A:  I did not test for – to try to quantify the difficulty of steering.  That's correct.

Q:  And so you do not have an objective testing data set at all.

A: No.

Q: What you have is your subjective conclusion based upon what may or may not be seen in objective testing.  However, you don't even know that that objective testing would show. Correct?

A: I've not done testing of the steering on the ATV.  That's true.

Q: Right.  So what you have is a subject evaluation of what you think the steering response will be.

A: Yes.

Dkt. 243-2, at 142.

In fact, Larson went so far as to concede that he did "[n]o validation testing" at all with respect to his theory that the alleged improper assembly of the ATV's right front axle had caused a  "difficult and unpredictable steering" response.  Dkt. 243-2, at 132.

Presumably in light of this testimony, Johnson concedes in response to Honda's motion that Larson "did not do any tests of the steering mechanism on the subject ATV or an exemplar ATV" and agrees that Larson indicated "his opinion of the steering effects was a subjective one."  Dkt. 258, at 12.

Fundamentally speaking, the scientific method involves generating hypotheses and testing them to determine whether they are correct.  *Daubert*, 509 U.S. at 593.  By his own admission, Larson failed to follow this basic scientific process because he never tested his theory.  Larson never verified that metal-to-metal contact between the axle shaft and CV joint would have caused any steering problem at all, and made no attempt to objectively quantify the extent of such a problem.  As a result, Larson's opinion that improper assembly of the ATV's right

front axle shaft had caused a "difficult and unpredictable" steering response was not supported by sufficient facts or data, and was not the product of reliable methodology.

In an attempt to show otherwise, Johnson makes a number of unconvincing arguments. Notwithstanding the fact that Larson did not test or validate his "difficult and unpredictable steering" hypothesis, Johnson takes the position that his testimony was otherwise supported by sufficient facts and data because he permissibly relied on information that he had "been made aware of or personally observed," as contemplated by Fed. R. Evid. 703.[3] To Johnson, it is significant that Larson "had possession of the physical components of the subject ATV" and visually inspected those components before concluding that the ATV had a steering problem. Dkt. 258, at 7. Johnson notes, for example, that "Larson found from [his] visual inspection that the axle did not look the way that an axle should look," that "[t]he axle did not fit into its corresponding cv joint, and the cv joint had metal particles in it." Dkt. 258, at 7. Johnson claims this was all "objective information that a reasonable juror could understand and that an expert would rely

---

[3] Rule 703 states, in relevant part, that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admissible. ..."

on in the field." Dkt. 258, at 7.

That may well be, but Honda has not challenged Larson's testimony under Rule 703. Honda's claim is that under Rule 702, Larson "cannot identify any objective data that is logically related to his opinions." Dkt. 263, at 9. Johnson fails to explain how Larson's basic observations as to the condition of the ATV's various component parts in any way substantiated or validated his theory that a difficult and unpredictable steering response would have resulted. In other words, while Larson's examination of the ATV's component parts may have provided the basis for his hypothesis, he never conducted any scientific testing to verify that his hypothesis was correct. Because Larson never subjected his hypothesis to the rigors of scientific testing, he never obtained the facts and data necessary to support his opinion that the ATV would have exhibited a "difficult and unpredictable" steering response.

Johnson also claims that Larson's opinion was supported by sufficient facts and data because Larson had received information about the nature of the crash from Johnson and his family. As Johnson notes, Larson testified that "he knew the vehicle had a steering failure directly prior to the crash" and "the facts reported were that the axle was on the vehicle at the time of the crash." Dkt. 258, at 7. Johnson maintains that this was relevant data, which Larson was entitled to accept

-10-

at face value and properly considered in forming his opinion. Whether to believe those reports, Johnson maintains, was for the jury to decide in determining how much weight to give to Larson's opinion.

While it is true that the jury is tasked with assessing credibility, the fact that Larson accepted without question that the ATV's steering had failed and the axle was on the vehicle when it crashed, illustrates another problem with Larson's methodology and its application to the facts of this case.  Larson assumed from the outset that the axle shaft was on the ATV at the time of the accident, and disregarded evidence that might have suggested otherwise.  When Larson first received the ATV, for example, there was dirt and mud-encrusted duct tape on the inboard CV joint and the outboard CV joint was filled with contaminated grease. Larson nonetheless "proceeded with the assumption that [the] shaft had been in place up until the time of the accident"[4] and disposed of the duct tape and grease without testing or analyzing them.[5]

---

[4] Dkt. 243-2, at 116.

[5] Honda has renewed its motion for dispositive sanctions based, in part, on the allegation that Larson spoliated critical evidence when he disposed of these materials.  According to Honda, the fact that the right front driveshaft's inboard insertion point was sealed off by dirty duct tape and its outboard insertion point was caked in grease and accumulated material likely meant that the ATV had been operated for a significant period of time before the crash without the right front driveshaft in place.  But because Larson did not preserve those materials, Honda

-11-

Larson essentially accepted as a premise that the axle shaft was in the ATV at the time of the crash and then extrapolated from there to an unfounded conclusion – that metal-to-metal contact between the axle shaft and CV joint had caused a "difficult and unpredictable" steering response in the ATV.  But because Larson never tested his theory, and failed to rule out the possibility that the axle shaft may have been missing when Johnson crashed, the analytical gap between the available data and his ultimate opinion was simply too great.  *See e.g., General Elec. Co.,* 522 U.S. at 146 (1997) (expert scientific testimony inadmissible if there is "too great an analytical gap between the data and the opinion offered"); *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (expert witness opinions were unreliable and properly excluded where no effort had been made to rule out other possible causes of the plaintiffs' injuries).

Johnson nonetheless argues that Larson's methodology was sound because he performed a number of other tests on the ATV's component parts "to inform his

---

claims it was deprived of the ability to conclusively establish that the axle was not in the ATV at the time of the crash.  If Honda had been able to definitively show that Johnson was operating the ATV without its right front axle when he crashed, it would have been in a far better position to defend against Johnson's theory of the case and rebut Larson's opinion.  Because the Court finds for the reasons set forth herein that Larson's  testimony must be stricken under Rule 702, however, Honda's motion for case-terminating sanctions based on the spoliation of evidence is moot and need not be addressed any further.

opinions" in the case.  Dkt. 258, at 10.  For example, Johnson cites the fact that Larson performed an Instron tensile examination, or "pull test," on the left front axle to measure the static force necessary to overcome the circlip capture force and pull the axle shaft out of the CV joint. Dkt. 243-2, at 37-40; 80.  As Larson explained it, he decided to conduct the test because, as reported by Johnson, "the shaft had apparently come out of the right side" during the crash and he "was very curious to find out how much force would have been required to extract that." Dkt. 243-2 at 39-40.  In Larson's words, he "learned the maximum force to overcome the circlip tension," learned that there was "some diminished force required to continue to pull the shaft all the way out," and discovered that "the further it gets extracted, the lower that force value is until finally it drops to zero and the shaft pops free."  Dkt. 243-2, at 44.   Larson did not claim to have learned anything about the ATV's steering.

In an attempt to determine whether the axle had been inserted completely at the time of manufacture, Larson then cut the CV joint in half to determine whether the circlip had expanded and left any marks inside the CV joint.  Dkt. 243-2, at 47-48.  Larson found "no obvious wear patterns," however, and described the results as "inconclusive."  Dkt. 243-2, at 49.  At that point, Larson removed some grease and metallic particles from the CV joint and sent it to a laboratory for testing.  Dkt.

243-2, at 53-54.  That testing simply "ruled out the possible presence of foreign

metallic materials within the CV joint recess," and had nothing to do with steering.

Dkt. 243-2, at 55.

Larson's next step was to perform Rockwell hardness test in an attempt to

find out why the right front axle appeared "shiny, smooth, [and] rounded

compared to the machined splined surface on a good axle." Dkt. 243-2, at 45.  The

test showed "that the splines were extremely hard and resistant to wear and the

rounded portion and the core of the shaft was relatively soft."  Dkt. 243-2, at 52.

To Larson, those results simply "explained the rounded shape" of the axle shaft

because they "seem[ed] to indicate that once the ends of those splines were

chipped off or ground off or broken off, then what's left would round off nicely

into the form seen."  Dkt. 243-2, at 52.   Once again, Larson did not claim to have

learned anything about the ATV's steering mechanism.

Nonetheless, Larson concluded based on his various test results that: (1)

there was a manufacturing defect in the ATV, namely, improper coupling of the

right front axle shaft and CV joint, and; (2) the manufacturing defect caused a

difficult and unpredictable steering response in the ATV.  Dkt. 243-2, at 58-61.

While Larson's tests may well have "informed his opinion" as to the presence of a

manufacturing defect, Johnson fails to explain how any of them substantiated,

-14-

validated, or even related to his theory that the alleged manufacturing defect affected the ATV's steering.  To the contrary, Larson made it abundantly clear on cross-examination that he did no validation testing at all to determine whether metal-on-metal contact between the axle shaft and CV joint would have caused a steering problem.  Dkt. 243-2, at 131-32, 142.  Larson admitted that he did "no testing to try to reproduce a difficult steering condition"; "no testing of any ATV with an improperly installed axle shaft or drive shaft"; and "no testing to try to validate [his] opinion about unpredictable or difficult steering."  Dkt. 243-2, at 130-33.  In fact, Larson conceded that his opinion was a "hypothesis that [he] did not test."  Dkt. 243-2, at 138.

Johnson nevertheless argues that Larson should not be faulted for failing to test his hypothesis because the steering "condition is inimitable, because there is no documentation of the exact conditions and placement of the axle at the moment of the steering failure."  Dkt. 258, at 11.  But the point here is not whether the exact condition and placement of the axle at the time of the accident can ever be known.  Rather, the point is that Larson developed a hypothesis, which he then failed to test or otherwise validate.  In addition, there is no evidence that Johnson's "difficult and unpredictable" steering theory has ever been subjected to peer review or publication, or that it is generally accepted in the relevant scientific

community.  *Barabin*, 700 F.3d at 431.

For all of the above reasons, Larson's opinion that improper assembly of the ATV's right front axle shaft caused a "difficult and unpredictable" steering response was not based on sufficient facts or data, and was the product of a fundamentally flawed methodology.  Consequently, Larson's opinion was not sufficiently reliable to be admitted under Rule 702.   Even if it could be said that Larson's opinion was sufficiently reliable, it would still have to be stricken because it did not "fit" the facts developed at trial and so failed to satisfy Rule 702's "relevancy" requirement.

B.    Relevance

Under Rule 702, for expert testimony to be relevant it must be sufficiently tied to the facts of the case so that it is of assistance to the trier of fact in resolving a disputed issue.  *Daubert*, 509 U.S. at 591.  In other words, the expert's opinion must "fit" the facts of the case and serve a "helpful" purpose to the jury.  *Daubert*, 509 U.S. at 591.  In evaluating relevancy, "the court must determine whether there is 'a link between the expert's testimony and the matter to be proved.'" *Stilwell v. Smith & Nephew, Inc.,* 482 F.3d 1187, 1192 (9th Cir. 2007) (*quoting United States v. Bighead,* 128 F.3d 1329, 1335 (9th Cir. 1997).

Honda takes the position that Larson's opinion was irrelevant because the

"difficult and unpredictable" steering response he described was unlike the

steering problem Johnson claimed to have experienced just before crashing his

ATV.  Larson testified that the steering response would be felt during "operation

of the vehicle in any condition other than when its going in a straight line," and

"would be especially apparent at large turn angles...."  Dkt. 243-2, at 61.  Larson

explained that "there would be feedback through the steering assembly that would

cause a feeling by the operator that the vehicle wanted to return to a straight line

condition," which meant that there would be a large degree of difficulty when the

steering angle[s] were severe and basically negligible when the vehicle is going in

a straight line."  Dkt. 243-2, at 62.

As Johnson described the moments leading up to the accident, however, he

"was approaching the corner and [he] went to turn," the steering "was stuck, so

[he] went straight off the corner and [he] wrecked."  Dkt. 243-3, at 25.  Johnson

stated that the ATV's handlebars essentially "locked up" as he was making his

straight approach to the turn in the road and he "couldn't move them."  Dkt. 243-3,

at 65.  Johnson indicated that he was unable to force the handlebars loose, even as

he stood up in an attempt to do so, and they remained locked as he went straight

off the edge of the road.  Dkt. 243-3 at 66.

Johnson and his brother-in-law, Rick Harrison, both testified that the

-17-

steering on the ATV had locked up in similar fashion one time earlier that day as

well.  Johnson described the first incident as follows:

> I was going down and I don't remember exactly what caused me to want to
> turn, but I went to try to turn and it went like this (indicating) and it stopped.
> It wouldn't go any farther . . . . And that's when Rick came up.  And he got
> on it and he – he looked first and he couldn't find anything wrong with it, so
> he got on it.  And then he started it up, tried it, to move the steering wheel.
> It wouldn't move much.  Then he started rocking it, you know, and started
> going forward.  And he got maybe  20, 20 yards, something like that, and it
> broke loose.

> Dkt. 243-3, at 20.

Harrison described the incident much the same way: "The steering locked up.

Well, when Zane told me that the steering was locked up, I tried to move it while it

was stationary and the steering handlebars wouldn't move."  Dkt. 243-1, at 25.

Harrison said he didn't "see anything that would stop the steering from – or, you

know, make the steering lock like that," so he "rode it about, I don't know, 20, 30

yards" when the steering "freed up."  Dkt. 243-1, at 26.

The "difficult and unpredictable" steering response to which Larson

testified was entirely different from that described by Johnson and Harrison.

Larson made clear that he "did not identify a condition where it was impossible to

turn the handlebars." Dkt. 243-2, at 131.  He agreed that while it might have felt to

the driver making a turn that the ATV wanted to return to a straight path of travel,

it still would have been possible to steer and to turn the handlebars to the left and right.  Dkt. 243-2, at 130-31.  Larson's description of the steering the problem he hypothesized would have resulted from improper assembly of the right front axle and CV joint simply does not "fit" with the steering problem that Johnson claims caused him to crash his ATV.

Johnson apparently believes that Larson's testimony does fit with the facts presented at trial, but his argument on this point is not exactly clear.  On the one hand, Johnson concedes that Larson "did not testify that the steering response was the same as that experienced by Mr. Johnson."  Dkt. 258, at 5.  This would suggest that Johnson agrees Larson's testimony does not "fit" the facts.  But Johnson also argues in somewhat contrary fashion that "the unpredictable steering response" Larson described was consistent with the factual testimony at trial.  Dkt. 358, at 5.  Specifically, Johnson maintains that his testimony and Larson's are consistent because "'[u]npredictable' describes a situation where steering would operate correctly for some period of time and then fail at an uncertain time."  Dkt. 258, at 12.

But that is not an accurate or complete description of the "unpredictable" steering response to which Larson testified.  Larson explained that when the steering response arose, it would feel to the operator attempting to make a turn that

-19-

the ATV wanted to return to a straight path of travel, but it would still be possible to steer and to turn the handlebars to the left and right.  Dkt. 243-2, at 130-31. Larson made clear that he had not identified a steering problem that would have made it impossible to turn the handlebars.   Dkt. 243-2, at 131.  According to Johnson's testimony, however, that is exactly what happened – he crashed because the handlebars "locked up" and he was unable to steer at all. Dkt. 243-3, at 65-66. Larson's testimony simply does not "fit" those facts.   Because Larson's "difficult and unpredictable" steering opinion did not fit the facts as they were presented at trial, it could have been of no help to the jury in deciding whether the alleged manufacturing defect caused Johnson to crash his ATV.  Larson's opinion thus failed to satisfy the Rule 702's "relevancy" requirement.

For all of the reasons set forth above, the Court concludes that Larson's "difficult and unpredictable" steering opinion must be stricken because it does not meet the reliability and relevance requirements of Rule 702.  Without Larson's opinion, Honda argues Johnson is not left with enough evidence in the record to establish the necessary elements of his manufacturing defect claim.[6]

---

[6] Even assuming, without deciding, that the remainder of Larson's testimony was properly admissible, Honda is entitled to judgment as a matter of law for the reasons set forth below.   The Court therefore declines to expressly consider whether Larson was qualified to testify, and whether his testimony as to the presence of a manufacturing defect should also be stricken.

### III.    Motion for Judgment as a Matter of Law

Honda moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) at the close of Johnson's case.  Dkt. 185.  The Court denied the motion after the jury was unable to reach a verdict, subject to Honda's right to renew the motion in light of the evidence presented at trial.  Dkt. 222.  Honda has since filed a renewed motion pursuant to Fed. R. Civ. P. 50(b).  *See Art Attacks Ink, LLC v MGA Entertainment Inc.*, 581 F.3d 1138, 1142-43 (9th Cir. 2009) (affirming judgment as a matter of law under Rule 50(b) after the jury was unable to reach a verdict on the plaintiff's claims, thereby indicating that such post-trial motions are procedurally appropriate).

Judgment as a matter of law is proper when the evidence permits only one reasonable conclusion.  *See Ostad v. Oregon Health Sciences University*, 327 F.3d 876, 881 (9th Cir. 2003).  To grant Honda's motion, the Court must find "that a reasonable jury would not have [had] a legally sufficient basis to find" in Johnson's favor.  Fed. R. Civ. P. 50(a)(1).  "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 250-51 (1986).   In making its decision, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *Lakeside-Scott v.*

*Multnomah County*, 556 F.3d 797, 802 (9ᵗʰ Cir. 2009).

At the close of trial in this case, the Court instructed the jury in accordance with Montana law that to prevail on his manufacturing defect claim, Johnson was required to prove the following by a preponderance of the evidence:

> First, that at the time of sale by American Honda Motor Company the product was in a defective condition because of a manufacturing defect. A manufacturing defect exists when a product fails to conform to its design.
>
> Second, that the manufacturing defect caused injury to Mr. Johnson.
>
> Dkt. 221, at 29.

The Montana Supreme Court has made clear that it is vital for the plaintiff in a strict products liability case to prove both that there was "a defect in the product and that such defect caused the injury complained of." *Scheleske v. Creative Nail Design, Inc.*, 933 P.2d 799, 803 (Mont. 1997). If Johnson failed to present legally sufficient evidence on any one of these essential elements, Honda is entitled to judgment as a matter of law. *Art Attack Ink*, 581 F.3d at 1143.

Expert testimony is necessary "when the issue presented is sufficiently beyond the common experience of the trier of fact and the expert testimony will assist the trier of fact in determine the issue or understanding the evidence." *Tin Cup County Water and/or Sewer Dist. v. Garden City Plumbing & Heating, Inc.*, 200 P.3d 60, 69 (Mont. 2008). There can be no real dispute that ATV assembly

and the effects that improper assembly may have on steering are beyond the common experience of the trier of fact, so to prevail at trial it was necessary for Johnson to present expert testimony in order to establish that a manufacturing defect caused the steering problem that he alleges made it impossible for him to negotiate the turn in the road.

Johnson does not argue otherwise.  Rather, he simply argues that it was within the "competency of the jury" to compare "the factual testimony to the expert evidence," and decide whether the manufacturing defect and steering problem identified by Larson caused Johnson's injuries.  Dkt. 257, at 11.

As discussed above, however, Larson's opinion that improper assembly of the ATV's right front assembly and CV joint caused a "difficult and unpredictable" steering response in the ATV is properly stricken because it does not satisfy the requirements for admissibility set forth in Rule 702. Without the benefit of Larson's opinion, Johnson has no evidence that the alleged manufacturing defect caused any steering problem at all.  And without that evidence, he cannot show that the alleged manufacturing defect caused his injuries.  Even viewing the remaining evidence in the light most favorable Johnson and drawing reasonable inferences in his favor, Johnson simply cannot show without the benefit of expert testimony that an alleged manufacturing defect

caused his injuries.   Johnson's manufacturing defect claim thus fails as a matter of law, and judgment must be entered in Honda's favor.

## IV.    Conclusion

Based on the foregoing,

IT IS ORDERED that Honda's Renewed Motion to Strike the Testimony of Plaintiff's Expert Robb Larson is GRANTED to the extent set forth above.

IT IS FURTHER ORDERED that Honda's Renewed Motion for Judgment as a Matter of Law is GRANTED.  Finally,

IT IS ORDERED that Honda's Renewed Motion for a Dispositive Spoliation Sanction is DENIED AS MOOT.

DATED this 31st  day of January, 2013

Jeremiah C. Lynch
United States Magistrate Judge

-24-